IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JULIEANN NAKI, Individually,<br>and as Special Administrator<br>of the Estate of NATHANIEL JOSHUA<br>NA WAʻE WAʻE MAKALA KA KAI<br>NAKI, RAYMOND K. NAKI, SR.,<br>RAYMOND K. NAKI, JR.,<br>ANTHONY NAKI, TERINA NAKI<br>and PALMER NAKI,<br><br>        Plaintiffs,<br><br>  vs.<br><br>COUNTY OF MAUI, MAUI POLICE<br>OFFICER FREDERICK WELCH;<br>MAUI POLICE OFFICER<br>NATHANAEL GANDEZA; DOE<br>INDIVIDUALS 1-10, DOE<br>PARTNERSHIPS 1-10, DOE<br>CORPORATIONS 1-10, DOE<br>GOVERNMENTAL ENTITIES 1-10,<br>and DOE ENTITIES 1-10,<br><br>        Defendants. | CIV. NO. 23-00383 SASP-WRP<br><br>ORDER GRANTING DEFENDANTS<br>COUNTY OF MAUI, FREDERICK WELCH,<br>AND NATHANAEL GANDEZA'S<br>MOTION FOR SUMMARY JUDGMENT,<br>FILED AUGUST 22, 2025, AND<br>DISMISSING PENDENT STATE CLAIMS<br>WITHOUT PREJUDICE |

ORDER GRANTING DEFENDANTS COUNTY OF MAUI,
FREDERICK WELCH, AND NATHANAEL GANDEZA'S
MOTION FOR SUMMARY JUDGMENT, FILED AUGUST 22, 2025,
AND DISMISSING PENDENT STATE CLAIMS WITHOUT PREJUDICE

      This case represents policing in moments of extreme uncertainty, where

split-second decisions can have permanent consequences. Faced with a dangerous situation that

quickly unfolded on April 30, 2023, officers tragically and fatally shot Nathaniel Joshua Na Waʻe

Waʻe Makala Ka Kai Naki ("Naki"). Even when a police shooting is legally justified, it still

means a life has been ended, and families are forever changed. Justification does not erase grief;

it only explains necessity. Having reviewed the record before it, this Court concludes that the officers' use of deadly force was necessary under the circumstances presented to them and that summary judgment in their favor is, therefore, proper.

I.        BACKGROUND[1]

A.        Orders for Protection

Naki's parents both sought and were granted orders for protection against Naki. Mother Julieann E. Naki's ("Mother") protective order took effect February 1, 2023, and expired on August 1, 2023. [Exh. E, ECF No. 56-11 at PageID.442.] This order prohibited Naki "from committing further acts of abuse or threats of abuse" and from "return[ing] to the residence located at 11800 Kamehameha V Hwy, Kaunakakai, HI 96748." [*Id.* at PageID.443.] Similarly, Father Raymond Leimana Kaiwi Naki's ("Father") protective order, effective April 19, 2023, through April 19, 2024, prohibited Naki "from committing further acts of abuse or threats of abuse" while also prohibiting Naki "from any contact with the" Father and from "visit[ing] or approach[ing] within 100 yards of any place where the [Father] lives or works or goes to school." [*Id.* at PageID.447–48.]

B.        Violation of Mother's Protective Order

On April 30, 2023, Stafford Caparida ("Caparida"), a pastor, police officer, and cousin to Naki, was preparing for morning services at the church where Mother's residence is located when Naki drove "erratically" onto the property in a blue sedan. [Caparida Decl., ECF No. 56-3 ¶¶ 2, 3, 5, 7–9.] Upon exiting his vehicle, Naki "began yelling and swearing loudly into

---

[1] The facts summarized in this section are taken primarily from the exhibits attached to the subject motion for summary judgment, as many of them are not in dispute. Such facts represent a broad--rather than exhaustive--overview of the relevant background information. Other facts pertinent to this Court's decision may be referenced below to the extent they are applicable.

his cell phone while pacing" on the property. [*Id.* ¶ 10.] Based on Naki's statements, Caparida

believed Naki was speaking to Mother. [*Id.* ¶ 11.] After yelling into his phone, Naki walked

toward Caparida and Caparida's son "while yelling, swearing, and trying to start a fight." [*Id.*

¶¶ 15–16.] Concerned that Naki had directed his aggression toward Caparida and Caparida's son,

at around 7:16 a.m., Caparida called police dispatch, requesting police assistance and reporting

that Naki "was on the property acting crazy." [*Id.* ¶¶ 18–20.] Naki saw Caparida on the phone

and began yelling that Caparida "had ratted him out." [*Id.* ¶ 22.] Naki returned to his vehicle,

"peeled out, and drove off headed east." [*Id.* ¶ 23.]

Caparida had never seen Naki "act in such an aggressive, agitated manner as he

did on April 30, 2023." [Caparida Decl. ¶ 13.] Caparida later described Naki's demeanor to be

"as if he had a demon inside him." [*Id.* ¶ 14.]

Approximately thirty minutes after Caparida had called dispatch, at around

7:41 a.m., Officers Frederick Welch ("Officer Welch" or "Welch") and Nathanael Gandeza

("Officer Gandeza" or "Gandeza") arrived on the property. [Caparida Decl. ¶ 25; Welch Decl.,

ECF No. 56-1 ¶ 21; Gandeza Decl., ECF No. 56-2 ¶ 14.] Dispatch had informed the officers that

Naki was on the property "acting crazy." [Welch Decl. ¶ 9; Gandeza Decl. ¶ 9.] Caparida spoke

to the officers, explaining the incident with Naki and informing them Naki "had left the property

headed east." [Caparida Decl. ¶ 26; *see also* Gandeza Decl. ¶ 15; Welch Decl. ¶¶ 23–25.] After

obtaining Caparida's statement, Officers Welch and Gandeza left the property to locate and arrest

Naki for violation of an order for protection. [Caparida Decl. ¶ 28; Gandeza Decl. ¶ 16; Welch

Decl. ¶¶ 26–27.]

### C.    Prior Police Contacts with Naki

Officer Welch--in his capacity as a police officer--has had prior contacts with Naki. These contacts included incidents where Mother had reported to police "Naki was acting violently or erratically." [Welch Decl. ¶ 13.] Though, Officer Welch has never had to draw his weapon on Naki. [*Id.* ¶ 14.] Officer Welch also knew Naki from them both having attended church services at Caparida's church. [*Id.* ¶ 11.]

Officer Gandeza--in his capacity as a police officer--also knew Naki from prior contacts. [Gandeza Decl. ¶ 10.] Officer Gandeza had served Naki with the restraining order Mother had obtained against him. [*Id.* ¶ 12.] Based on Officer Gandeza's experience, Naki was known to be "very combative and prone to yelling." [*Id.* ¶ 11.]

### D.    The Shooting[2]

After Officers Welch and Gandeza had left Mother's property on April 30, 2023, they located Naki's vehicle on the shoulder of the roadway approximately thirty yards from Mother's property. [Gandeza Decl. ¶ 17; Welch Decl. ¶ 28.] Officer Welch parked his police vehicle on the shoulder about two car lengths away from Naki's vehicle, while Officer Gandeza parked his police vehicle partially in the roadway, behind Officer Welch's. [Gandeza Decl. ¶¶ 18–19; Welch Decl. ¶¶ 29–30.]

Upon exiting their vehicles, Officers Welch and Gandeza encountered Naki who was walking toward them while holding in his right hand what the officers immediately

---

[2] The facts in this section are largely deduced from the footage captured by the officers' respective body-worn cameras, which are attached as Exhibits F and G to "Defendants County of Maui, Frederick Welch, and Nathanael Gandeza's Concise Statement of Facts in Support of its Motion for Summary Judgment" [ECF No. 56]. Plaintiffs do not appear to dispute the events as depicted by the officers' body-worn cameras, nor do they dispute the admissibility and authenticity of such evidence.

recognized to be a large machete. [Gandeza Decl. ¶¶ 20–22; Exh. G, Gandeza Body-Worn

Camera ("Gandeza BWC") 07:50:21[3]; Welch Decl. ¶¶ 31–32; Exh. F, Welch Body-Worn Camera

("Welch BWC") 07:50:21.] The machete, which measured approximately 23 inches in length,[4]

was tucked under Naki's left arm, with several inches of the blade visible over Naki's left

shoulder. [Welch BWC 07:50:23; Gandeza Decl. ¶ 22.] The officers immediately drew their

firearms and pointed them at Naki. This encounter between Naki and the officers continued for

approximately three minutes.

      Officer Gandeza, in due course, notified dispatch that Naki had a machete and

issued a directive "to clear the air." [Gandeza Decl. ¶ 26; Gandeza BWC 07:50:46.]

Officer Gandeza positioned himself to the side, behind Officer Welch who was standing near his

police vehicle, and issued repeated commands to Naki to put the machete down, at one point

warning Naki to "put the fuckin shit down or you gonna get fuckin shot." [Gandeza Decl. ¶ 27;

Gandeza BWC 07:50:23–28.] Similarly, for about five seconds, Officer Welch repeatedly yelled

to Naki to "put it down!" [Welch BWC 07:50:23–28.] In response, Naki said, "I not harming

you." [Welch BWC 07:50:29; Gandeza 07:50:30.] Officer Welch again instructed Naki to "put it

down," and Naki again said, "I not harming you." [Welch BWC 07:50:30–31; Gandeza BWC

07:50:30–31.] When Officer Welch then directed Naki to "put it down now," Naki responded,

"nah." [Welch BWC 07:50:31–32; Gandeza BWC 07:50:31–32.] Officer Welch repeated "put it

down," to which Naki again said, "I not harming you," prompting Officer Welch to, once again,

---

[3] The referenced time is approximate, plus or minus five seconds, based on the information
displayed in the top right corner of the cited footage.

[4] The officers' declarations do not specifically identify the length of the machete, only describing
it to be "large." [Welch Decl. ¶ 31; Gandeza Decl. ¶ 21.] However, Plaintiffs do not dispute
Defendants' description of the machete as measuring approximately 23 inches long, [*see* ECF
No. 61 at PageID.574 ¶ 25,] and this description appears to be substantiated by the officers'
body-worn cameras.

instruct Naki to "put it down." [Welch BWC 07:50:33–35.] At the same time, Officer Gandeza

twice yelled at Naki to "put the fuckin machete down or you gonna get shot!" [Gandeza BWC

07:50:34–36.]

       After the initial exchange, Naki walked away from the officers--toward his car--as

Officer Welch followed him. [*Id.* 07:50:36–43; Welch BWC 07:50:36–42.] Officer Welch

deployed the taser as Officer Gandeza continued to instruct Naki to put down the machete. [*Id.*]

However, the taser was not successful in gaining Naki's compliance. [*Id.*] Officer Gandeza then

repeated his commands twice to Naki to "put down the fuckin machete," but Naki did not

comply. [Gandeza BWC 07:50:40–43.] Officer Welch also instructed Naki to "put it down now,"

to which Naki responded, "you harm me, I nevah harm you." [Welch BWC 07:50:43–44;

Gandeza BWC 07:50:43–44.] Both officers continued to give multiple commands to Naki to put

down the machete, with Officer Gandeza at one point warning Naki to "put it fuckin down or I'll

shoot you" and Officer Welch yelling, "I'm telling you put it fuckin down" and "Nathaniel, put it

down!" [Welch BWC 07:50:49–59; Gandeza BWC 07:50:49–59.] Naki, still holding the

machete, responded by raising his voice at Officer Welch and saying that what he did was wrong,

presumably referring to when Officer Welch had deployed his taser earlier in the encounter.

[Welch BWC 07:51:00; Gandeza BWC 07:51:00.] Again, Officers Welch and Gandeza issued

multiple commands to Naki to put down the machete, to which Naki responded "no." [Welch

BWC 07:51:02–07; Gandeza BWC 07:51:04–07.] Officer Welch repeated his commands to

Naki--about three more times--to put down the machete, while Officer Gandeza yelled, "put

down the fuckin machete!" [Welch BWC 07:51:07–12; Gandeza BWC 07:51:09–12.]

       In apparent attempts to provoke Officer Welch, Naki urged him to shoot, to which

Officer Welch responded, "I don't wanna shoot." [Welch BWC 07:51:13–15; Gandeza BWC

07:51:13.] In the meantime, Officer Gandeza again ordered Naki to "put down the machete."

[Gandeza BWC 07:51:14.] Defiantly, Naki began moving toward Officer Welch, prompting both

officers to yell "don't" and "back the fuck up!" [Welch BWC 07:51:15–17; Gandeza BWC

07:51:16–17.] Naki responded, "I nevah do nothing wrong," as Officer Welch repeated "don't."

[Welch BWC 07:51:17–19.] Naki again told Officer Welch, presumably in relation to the earlier

taser deployment, that what he did was wrong, repeating this as Officer Welch again told Naki

"don't," and Officer Gandeza yelled, "back the fuck up!" [Welch BWC 07:51:19–21; Gandeza

BWC 07:51:19–20.] Officer Welch subsequently told Naki who was advancing toward him,

"don't do it," and Naki responded, "I not doing anything." [Welch BWC 07:51:21–23.]

Officer Welch again instructed Naki to "put it down now," to which Naki repeated, "I not doing

anything," with Officer Welch then expressing, "Thaniel, I don't wanna kill you today!" [*Id.*

07:51:23–26.] Simultaneously, Officer Gandeza directed Naki to "back the fuck up." [Gandeza

BWC 07:51:23.]

   Officer Welch proceeded to issue more commands to Naki, repeatedly instructing

him to put down the machete, while Naki urged Officer Welch in a provoking manner to "go

ahead." [*Id.* 07:51:26–28; Welch BWC 07:51:27–33.] Fearing that Naki was too close in

proximity to Officer Welch, Officer Gandeza told Welch to "back up little bit" while also

instructing Naki to "stay right there, stay the fuck right there." [Gandeza BWC 07:51:30–34;

Gandeza Decl. ¶ 39.] Naki moved backward, only to again advance forward while pointing at

Officer Welch and yelling, "brah you wrong!" [Welch BWC 07:51:34–40.] Officer Welch again

instructed Naki to put down the machete and told Naki he was wrong. [*Id.* 07:51:38–40.]

Meanwhile, Officer Gandeza shouted to Naki to "drop the fuckin machete!" [Gandeza BWC

07:51:36.] Naki did not comply and advanced toward Officer Welch, again saying "you wrong";

this prompted both officers to yell "back up!" [*Id.* 07:51:38–43; Welch BWC 07:51:41–43.]

Apparently challenging Officer Welch, Naki then said, "come on." [Welch BWC 07:51:44.]

Officer Welch thereafter issued additional commands to Naki to put down the machete, at one

point backing up slightly at the request of Officer Gandeza. [*Id.* 07:51:45–54; Gandeza BWC

07:51:46–53.] This was the second time Officer Welch had retreated after Officer Gandeza had

asked him to do so.

       In attempts to plead with Naki, Officer Welch stated, "come on bah, put it down."

[Welch BWC 07:51:55–56; Gandeza BWC 07:51:54.] Naki and Officer Welch then argued,

during which argument Naki yelled at Officer Welch that what he "just did was wrong" and

Officer Welch responding that what Naki did was wrong, that Naki had been told many times to

not "go ova dea," but that Naki kept "going ova dea." [Welch BWC 07:51:57–07:52:07; Gandeza

BWC 07:51:57–07:52:07.] Naki denied "going ova dea," to which Officer Welch replied that

Naki "did go ova dea" and that Naki argued with people at the property. [Welch BWC

07:52:07–09; Gandeza BWC 07:52:07–09.] Again moving forward, Naki sneered, asking

Officer Welch if he was scared. [Welch BWC 07:52:11; Gandeza BWC 07:52:11.] Officer Welch

repeated that Naki was "not supposed to go ova dea," causing Naki to yell, "that's my land!"

[Welch BWC 07:52:12–14; Gandeza BWC 07:52:12.]

       Officer Gandeza attempted to reason with Naki. He lowered his gun and said in a

calm voice, "hey, hey, just drop the machete bro, listen to me, drop the machete." [Gandeza

BWC 07:52:13–18.] At the same time, Officer Welch instructed Naki to put down the machete,

at one point saying, "please." [Welch BWC 07:52:15–18.] Continuing in his efforts to gain

Naki's compliance, Officer Gandeza then said, "you ain't gotta get to this point," repeating this

statement a second time. [Gandeza BWC 07:52:19–23.] Officer Welch again told Naki to "put it

down bah," but Naki refused, responding, "nah, nah, nah." [Welch BWC 07:52:18–21.] Naki then said, "I back off, you guys back off," eventually moving backward, while Officer Welch told Naki, "no, no, drop the machete." [*Id.* 07:52:21–26; Gandeza BWC 07:52:24–25.] Officer Gandeza then said, "drop the machete bro," as Officer Welch repeated the same commands to Naki two more times, but Naki again did not comply, moving forward and sharply telling the officers to drop their "guns right now." [Welch BWC 07:52:27–31; Gandeza BWC 07:52:26–31.] When Officer Welch responded "no, you drop your machete," Naki defiantly asked "why," to which Officer Welch replied, "we in charge." [Welch BWC 07:52:31–33; Gandeza BWC 07:52:31–34.] Officers Welch and Gandeza repeated their commands to Naki to put down the machete, but Naki refused and, at one point, stated, "you guys wen shoot already." [Welch BWC 07:52:34–38; Gandeza BWC 07:52:34–35.] Officer Gandeza again implored Naki to drop the machete, but he did not comply. [Gandeza BWC 07:52:37.]

Advancing toward Officer Welch, Naki twice yelled at the officers to "get the fuck outta my life right now" and then a third time, "get outta my life right now!" [*Id.* 07:52:39–43; Welch BWC 07:52:39–43.] Officer Welch shouted at Naki to put the machete down and, repeatedly, to stop, while Officer Gandeza yelled twice, "back the fuck up or we gon' shoot you!" [Welch BWC 07:52:44–47; Gandeza BWC 07:52:44–48.] Naki responded, "I not swinging," and when Officer Welch then instructed him to "put it down," Naki repeated, "I not swinging," prompting Officer Welch to again yell, "put it down!" [Welch BWC 07:52:48–50; Gandeza BWC 07:52:49–51.]

Naki turned around to walk toward his car, after which Officer Welch, from a slight distance behind, followed him and asked, "Thaniel, where you going bah?" [Welch BWC 07:52:51–54; Gandeza BWC 07:52:53–54.] Naki turned around to face Officer Welch and began

advancing while saying "oh, oh" and telling the officers to "back the fuck up." [Welch BWC 07:52:55–58; Gandeza BWC 07:52:55–56.] As Naki was advancing, both officers instructed him to "back up." [Welch BWC 07:52:58–59; Gandeza BWC 07:52:56.]

In a challenging manner, Naki began encouraging Officer Welch to shoot, repeating this multiple times while continuing to advance toward Officer Welch. [Welch BWC 07:52:59–07:53:03; Gandeza BWC 07:52:59–07:53:03.] As Naki moved toward the officers, Officer Welch instructed Naki several times to "back up." [Welch BWC 07:52:59–07:53:03.] Continuing his forward movement, Naki kept repeating, "go ahead, shoot." [*Id.*] At one point, Naki walked backward but then advanced forward again while encouraging Officer Welch to shoot. Officer Welch yelled to Naki to stop as Officer Gandeza ordered Naki to "back the fuck up!" [Welch BWC 07:53:04–08; Gandeza BWC 07:53:04–07.] Naki then said twice, "I not swinging," to which Officer Gandeza responded, "it doesn't matter, you get one machete." [Welch BWC 07:53:08–10; Gandeza BWC 07:53:08–10.] Naki subsequently yelled to Officer Gandeza, "you back the fuck up!" [Welch BWC 07:53:10; Gandeza BWC 07:53:11.] Officer Welch issued repeated commands to Naki to put down the machete, but Naki refused and continued to move forward while also challenging Officer Welch, saying things like "come on shoot" and repeatedly saying "come on." [Welch BWC 07:53:12–17; Gandeza BWC 07:53:11–16.]

Once Naki was within three to five feet of Officer Welch and still advancing with the machete in hand in direct defiance of the officers' orders to back up and to drop the machete, both officers fired their guns at Naki. [Welch BWC 07:53:17–18; Welch Decl. ¶¶ 53–54; Gandeza BWC 07:53:16–19; Gandeza Decl. ¶¶ 46–48.] Naki fell forward but then propped himself upward in a kneeling position while still holding the machete and saying in a seemingly

10

provoking manner, "huh? Huh?" [Welch BWC 07:53:19–21; Gandeza BWC 07:53:21.]

Officer Welch moved backward, with his gun still aimed at Naki, and yelled commands like

"stop bah," "put it down," and "drop it"; Officer Gandeza likewise yelled at Naki to "drop the

fuckin machete," giving a similar command a second time. [Welch BWC 07:53:21–26; Gandeza

BWC 07:53:22–24.] Naki then fell forward again, after which Officer Welch repeatedly said

"no" and "kick the machete away." [Welch BWC 07:53:27–45; Gandeza BWC 07:53:33.] When

Naki apparently stopped making movements or gestures toward the officers, Officer Gandeza

walked over to Naki and removed the machete from underneath him. [Welch BWC 07:53:45;

Gandeza BWC 07:53:43.] Both officers then checked on Naki and began administering

life-saving measures.

       Approximately three minutes had passed between the initial encounter and the

shooting. During and immediately after this incident, people began to gather where the officers

had been interacting with Naki. [Gandeza Decl. ¶ 43; *see also* Gandeza BWC 07:54:32 (officer

telling a male driver to back up); Welch BWC 08:02:33 (officer interacting with a female driver

of a truck who had driven up), 08:04:29 (camera showing three cars on the side of the road),

08:05:20 (officer speaking to a man who had approached, with the officer's camera showing a

number of people congregating on the road), 08:06:22 (officer turning himself to apparently

interact with yet another man who had approached).]

## II.        RELEVANT PROCEDURAL HISTORY

       Nearly five months after the tragic shooting, on September 14, 2023, Plaintiffs[5]

filed a Complaint in this Court against the County of Maui ("County") and "Doe Police

Officers," among others, alleging that the defendants violated Naki's rights under the United

---

[5] "Plaintiffs" are comprised of Naki's estate, his parents, and his siblings. [ECF No. 18 ¶¶ 2–5.]

States Constitution, the Hawaiʻi Constitution, and the laws of the State of Hawaiʻi. [ECF No. 1.]

Then, on October 13, 2023, Plaintiffs filed a First Amended Complaint ("FAC"). [ECF No. 9.]

After the Court dismissed the FAC with partial leave to amend pursuant to a motion brought by

the County, on March 1, 2024, Plaintiffs filed a Second Amended Complaint ("SAC") against the

County and Officers Welch and Gandeza (collectively, "Defendants"). [ECF Nos. 11, 16, 18.]

The parties subsequently stipulated to dismiss with prejudice Count I of the SAC only as to the

County. [ECF No. 21.] Hence, the remaining causes of action alleged in the SAC are as follows:

(1) Count I: a 42 U.S.C. § 1983 claim against Officers Welch and Gandeza, asserting violations

of the Fourth and Fourteenth Amendments to the United States Constitution; (2) Count II:

intentional infliction of emotional distress against Defendants; (3) Count III: wrongful death

against Defendants; (4) Count IV: negligent infliction of emotional distress, pain, and suffering

against Defendants; (5) Count V: malicious, willful, and wanton conduct against Officers Welch

and Gandeza; and (6) Count VI: negligence, vicarious liability, and respondeat superior against

Defendants. [ECF No. 18 ¶¶ 29–56.]

        On August 22, 2025, Defendants moved for summary judgment on Plaintiffs'

Section 1983 claims, arguing that the officers' conduct was objectively reasonable and that, even

if it was not, they are entitled to qualified immunity. [ECF No. 55 at PageID.342–51.]

Defendants add that the officers' conduct did not "shock the conscience" and that, should

Plaintiffs' federal claims be eliminated, this Court may decline to exercise supplemental

jurisdiction over the state law claims. [*Id.* at PageID.352–53.] Plaintiffs opposed Defendants'

motion on September 24, 2025. [ECF No. 59.] In support of their opposition, Plaintiffs submitted

the report of their expert witness, John D. McCarthy ("McCarthy"),[6] who opined that

Officers Welch and Gandeza's use of deadly force against Naki was not justified, concluding that

Naki posed no immediate threat to the officers or others and that the "officers' actions were

inconsistent with accepted standards of police practice, training and policy concerning the use of

force." [Exh. 1, ECF No. 60 at PageID.508.] McCarthy reasoned that the officers' actions were

not justified under the Hawaii Revised Statutes; the officers "could have retreated a reasonable

distance" and maintained efforts to gain Naki's compliance; Naki never raised the machete

toward the officers or threatened to use it; and the crime for which Naki was arrestable on the

date of the incident "did not involve the use or threatened use of deadly force." [*Id.* at

PageID.511–13.] Defendants replied on October 1, 2025. [ECF No. 62.] And a hearing on

Defendants' motion for summary judgment was held on October 29, 2025. [ECF No. 65.]

## III.        STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), "The

court shall grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A principal purpose of the summary judgment rule "is to isolate and dispose of factually

unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The

"threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved

only by a finder of fact because they may reasonably be resolved in favor of either party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

---

[6] Prior to retirement, McCarthy was in law enforcement for more than forty-five years, with four of those years served in the role of deputy police chief of the Honolulu Police Department. [Exh. 1, ECF No. 60 at PageID.517.] Since his retirement, McCarthy has "consulted in" at least "ten police practices cases" within various contexts. [*Id.*]

The moving party has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted). Once the movant has met this burden, the opposing party must come forward with "any significant probative evidence tending to support (his legal theory)" to defeat summary judgment. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 282 (9th Cir. 1979) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)), *reh'g denied* (9th Cir. 1980). "[A] nonmoving party must 'go beyond the pleadings and, by [his] own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."'" *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (quoting *Celotex Corp.*, 477 U.S. at 324). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48.

The court must review the record as a whole and draw all reasonable inferences in favor of the nonmoving party. *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149–50 (2000)); *Marable v. Nitchman*, 511 F.3d 924, 929 (9th Cir. 2007) (citing *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003)). It does not weigh the evidence but only determines whether there is a genuine issue for trial. *Marable*, 511 F.3d at 929 (citing *Abdul–Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996)).

**IV.        DISCUSSION**

As a preliminary matter, this Court views the facts in this case in the light

depicted by the officers' body-worn cameras. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007)

(holding that the Eleventh Circuit should not have relied on the respondent's version of events,

which was "so utterly discredited by the record that no reasonable jury could have believed him,"

and that the Court of Appeals "should have viewed the facts in the light depicted by the

videotape"); *Hernandez v. Town of Gilbert*, 989 F.3d 739, 746 (9th Cir. 2021) ("While we view

the facts in the light most favorable to the non-moving party at the summary judgment stage, we

are not required to accept a non-movant's version of events when it is clearly contradict[ed] by a

video in the record." (alteration in original) (citation and internal quotation marks omitted)).

In their Motion, Defendants argue they are entitled to summary judgment on

Plaintiffs' claims of Fourth Amendment excessive force and Fourteenth Amendment deprivation

of a familial relationship. [ECF No. 55-1 at PageID.342–53.] They also contend that the Court

may decline to exercise supplemental jurisdiction over Plaintiffs' claims under state law. [*Id.* at

PageID.353.] This Court analyzes each contention sequentially.

**A.        Fourth Amendment**

Defendants maintain Officers Welch and Gandeza are entitled to qualified

immunity from Plaintiffs' excessive force claim under the Fourth Amendment. Qualified

immunity shields public officials from civil damages "unless '(1) they violated a federal statutory

or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the

time."'" *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 914 (9th Cir. 2014) (quoting

*District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)).

1.    *The officers did not violate a federal statutory or constitutional right.*

Under the first prong of the qualified immunity test, the Court must determine whether Officers Welch and Gandeza's use of deadly force on Naki violated the Fourth Amendment's prohibition against unreasonable seizures. *See Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1060 (9th Cir. 2024) (citations omitted). To determine whether the force used to effect a seizure was reasonable, the Court must examine "whether it would be objectively reasonable for the officer[s] to believe that the amount of force employed was required by the situation [they] confronted." *Napouk*, 123 F.4th at 915 (quoting *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation omitted). This evaluation must account "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

The "reasonableness" inquiry in an excessive force case "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Napouk*, 123 F.4th at 915 (quoting *Graham*, 490 U.S. at 396). The strength of the government's interest is based on a totality of the circumstances, to include the following factors articulated in *Graham*: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citation omitted). Of these *Graham* factors, the "most important" is the immediacy of the threat posed by the suspect. *Lal v. California*, 746 F.3d 1112, 1117 (9th Cir. 2014) (citing *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011)). But the

16

*Graham* factors are not exclusive, and other factors--like the availability of less intrusive means

of force and whether the suspect was obviously emotionally disturbed--are relevant to the totality

of the circumstances. *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011) (citations

omitted).

                 a.       *Immediacy of the threat posed by the suspect*

      This Court addresses first the "most important" factor: whether Naki posed an

immediate threat to the safety of Officers Welch and Gandeza or others.

      Where a suspect disregards officer commands and advances toward officers while

holding an object perceived to be a weapon, the Ninth Circuit Court of Appeals ("Ninth Circuit")

has concluded that such officers are objectively reasonable to view the suspect as an immediate

threat. In *Napouk*, two officers responded to reports of a person ("decedent") walking around a

residential area with a "machete" or "slim jim," acting suspiciously and peering into cars and

houses. 123 F.4th at 912. When they arrived, officers interacted with the decedent who appeared

to be holding a machete. *Id.* at 913. One officer drew his gun and immediately told the decedent

to drop the long object that was in his hand. *Id.* This officer repeated his command, but the

decedent did not comply. *Id.* The second officer also drew his gun, moved toward the decedent,

and told the decedent to put the long object on the ground. *Id.* The decedent stood still for a few

seconds, holding the object at his side. *Id.* One of the two responding officers reported that the

decedent was not following commands and that they were going to have to shoot him. *Id.* The

decedent then walked toward where one of the officers was standing as both officers continued to

repeat commands to drop the long object. *Id.* The decedent failed to follow these commands and

slowly advanced in the officers' direction, causing them to retreat several times. *Id.* at 913–14. At

one point, one officer warned the decedent that if he took one more step toward them, "I will

shoot you." *Id.* at 913. At another point, the other officer told the decedent, "I don't want to shoot

you today." *Id.* at 914. The decedent came within nine feet of the officers, at which point they

shot him multiple times. *Id.* After the shooting, it was discovered that the object was a plastic toy

shaped to look like a blade. *Id.* The Ninth Circuit held that the officers were entitled to qualified

immunity from the excessive force claim, reasoning that the officers' use of deadly force was

objectively reasonable because, *inter alia*, the decedent posed an immediate threat to them when

they fired. *Id.* at 914–19; *see also Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1116 (9th Cir.

2005) (holding that it was objectively reasonable for officers to view a suspect holding a sword

as an immediate threat when he attempted to enter a house or yard and failed to comply with

warnings or commands to put down the weapon).

       The Ninth Circuit's decision in *Napouk*, which underscores circumstances very

similar to the ones present here, reinforces the principle that the "reasonableness" of a police

officer's "use of force must be judged from the perspective of a reasonable officer on the scene."

123 F.4th at 915 (quoting *Graham*, 490 U.S. at 396). From this perspective, Officers Welch and

Gandeza had cause to believe that Naki posed an immediate danger to them and to others in the

area on April 30, 2023. *See Blanford*, 406 F.3d at 1116. Naki was on a public roadway armed

with a 23-inch-long machete, he advanced in the officers' direction with the machete in hand,

and he failed to heed the officers' repeated commands to stop or back up and to drop the

machete. When the officers fired their guns at Naki, he was within approximately three to five

feet of Officer Welch, had ignored the officers' repeated commands, and had moved toward them

several times, causing them to retreat more than once as the encounter continued. These facts,

objectively and reasonably, led the officers to conclude that the situation could not be resolved

by talking and that Naki posed an immediate risk of harm to Officer Welch. *See Blanford*, 406

F.3d at 1116.

Plaintiffs argue that Naki did not pose an immediate threat because a 23-inch-long machete is not a deadly weapon per se, and he was not using it as such. In support of this proposition, they cite to *Glenn*, 673 F.3d 864, and *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001). But those cases are distinguishable. In *Glenn*, officers responded to reports of a suicidal man holding a pocketknife. 673 F.3d at 873. When they arrived, the officers stood several feet away from the man, and no bystanders were close enough to the man to be harmed by him. *Id.* at 874. Although the man did not respond to the officers' orders to put the knife down, the man remained in the same position and made no attempts to move until the officers shot him. *Id.* at 873–74. In *Deorle*, the suspect was unarmed; he committed no serious crime; he was given no warning of the imminent use of a significant degree of force; he posed no risk of flight; he complied with officer commands; and he presented "no objectively reasonable threat to the safety of the" responding officer or others. 272 F.3d at 1285.

Neither of the cases Plaintiffs cite stand for the proposition that a suspect armed with a machete poses an immediate threat *only* when that suspect uses the machete as a deadly weapon. In fact, the Ninth Circuit has repeatedly rejected a similar argument. The Fourth Amendment does not always require "officers to delay their fire until a suspect turns his weapon on them." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). If the suspect "is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *Id.* Instead, the caselaw requires courts to engage in a context-specific analysis, evaluating the totality of the circumstances to determine whether there are objective factors to justify a concern for the safety of the officers or others. *Id.* at 837–39 (citations omitted); *Glenn*, 673 F.3d at 872–73 (citing *Blanford*, 406 F.3d at 1115–19); *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citations omitted).

19

Here, the undisputed facts show that Naki repeatedly disobeyed officer commands to stop or back up and to drop the machete. By telling Naki that they would shoot him if he did not put down the machete, Officers Welch and Gandeza suggested "their reasonable perception that they saw further deliberate movement toward them with the [machete] as a threat." *See Napouk*, 123 F.4th at 918. Rather than comply with the officers' repeated commands, Naki continued to hold the machete and deliberately advance in the officers' direction. *See id.*

Naki's verbal communication to the officers that he was not harming them or swinging the machete at them does not make the officers' perception of threat any less reasonable. The objective circumstances and the threat posed by a suspect's conduct control the reasonableness inquiry under the Fourth Amendment. *See Graham*, 490 U.S. at 397 ("[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ." (citations omitted)). Here, when the officers fired upon Naki, he was advancing toward them while armed with a weapon. Focusing on what a reasonable officer on the scene would do under the known circumstances, Naki's physical conduct created an objectively reasonable perception of threat regardless of his accompanying verbal assurances.

In short, Officers Welch and Gandeza were justified in their belief that Naki posed an immediate threat when he advanced toward them with a weapon. The first *Graham* factor accordingly weighs in favor of a finding of reasonableness.

        *b.*     *Severity of the crime at issue*

The Court next addresses the severity of the crime at issue. Plaintiffs argue that the crime for which Naki was arrestable and why Officers Welch and Gandeza had pursued him was a misdemeanor violation of an order for protection ("VOP"). Although a VOP is in fact a misdemeanor under Hawaiʻi law, *see* Hawaii Revised Statutes ("HRS") § 586-11(a), Plaintiffs'

20

argument fails to account for the fact that this crime involves allegations of domestic violence, *see* HRS §§ 586-3(a) ("There shall exist an action known as a petition for an order for protection in cases of domestic abuse."), 586-1 (defining "[d]omestic abuse"--in relevant part--as "[p]hysical harm, bodily injury, assault, or the threat of imminent physical harm, bodily injury, or assault, extreme psychological abuse, coercive control, or malicious property damage between family or household members; or" any act constituting abuse of family or household members under HRS § 709-906). And the Ninth Circuit "take[s] very seriously the danger that domestic disputes pose to law enforcement officers." *Mattos*, 661 F.3d at 450. That is, "[d]omestic violence situations are 'particularly dangerous' because 'more officers are killed or injured on domestic violence calls than on any other type of call.'" *George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) (quoting *Mattos*, 661 F.3d at 450). But even if the "domestic dispute" was over by the time the officers encountered Naki, at the moment the officers fired their guns, Naki could have raised the machete instantly and struck Officer Welch with it.

The Ninth Circuit has "used the severity of the crime at issue as a proxy for the danger a suspect poses at the time force is applied." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019) (citing *Lowry v. City of San Diego*, 858 F.3d 1248, 1257 (9th Cir. 2017)). Here, Naki may have committed, at minimum, a number of felonious crimes as the event unfolded, including Terroristic Threatening in the First Degree under HRS § 707-716,[7] Attempted Assault

---

[7] "A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening: . . . With the use of a dangerous instrument . . . ." HRS § 707-716(1)(e).

Against a Law Enforcement Officer in the First Degree under HRS §§ 705-500[8] and 707-712.5,[9]

or Attempted Assault in the Second Degree under HRS §§ 705-500 and 707-711[10]. These crimes

are sufficiently serious and dangerous.

Plaintiffs dispute Defendants' contention that the crime at issue was a violent

felony. [ECF No. 59.] In support, Plaintiffs rely on McCarthy's report, which includes his

opinion that Naki "took no action or word that would constitute a felony offense under Hawaii

law." [*Id.* at PageID.475 (citation omitted).] At the outset, this opinion is wholly refuted by the

Court's finding in the previous paragraph that Naki may have committed multiple serious and

dangerous felonies. But beyond that, McCarthy's isolated opinion, along with many others in his

report,[11] constitutes a legal conclusion that is an improper topic for expert opinions. The Ninth

Circuit has repeatedly affirmed that an expert witness cannot render an opinion as to a legal

---

[8] "A person is guilty of an attempt to commit a crime if the person: (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime." HRS § 705-500(1).

[9] "A person commits the offense of assault against a law enforcement officer in the first degree if the person: (a) Intentionally or knowingly causes bodily injury to a law enforcement officer who is engaged in the performance of duty . . . ." HRS § 707-712.5(1)(a).

[10] "A person commits the offense of assault in the second degree if the person: (a) Intentionally, knowingly, or recklessly causes substantial bodily injury to another; . . . [or] (d) Intentionally or knowingly causes bodily injury to another with a dangerous instrument . . . ." HRS § 707-711(1)(a), (d).

[11] Other opinions within McCarthy's report are as follows: (1) the officers' use of deadly force was not justified under HRS § 703-304(5)(b) because they "could have retreated a reasonable distance and maintain[ed] their efforts to gain [Naki's] compliance . . . through de-escalation methods"; (2) the officers' use of deadly force was not justified under HRS § 703-307(3)(d)(i) because "the crime for which Mr. Naki committed did not involve the use or threatened use of deadly force"; and (3) the officers' use of deadly force was not justified under HRS § 703-307(3)(d)(ii) because "the officers could have employed alternative methods such as retreating and continued verbal commands to delay the arrest and successfully arrest him." [ECF No. 60 at PageID.511–12, 512–13.]

conclusion. *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 337 (9th Cir. 2017) (citing *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1052 (9th Cir. 2012)); *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (citing *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)); *United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999) (citations omitted); *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (citation omitted); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 426–27 (2007) (concluding that summary judgment was appropriate because there was no dispute over an issue of material fact, and the expert testimony on a legal determination could not create such a dispute). Therefore, the Court rejects McCarthy's opinions on the law as improper legal conclusions that cannot preclude summary judgment.

The second *Graham* factor weighs in favor of a finding that the officers' use of deadly force in this case was reasonable.

c.    *Whether the suspect was actively resisting arrest or attempting to evade arrest by flight*

"The final *Graham* factor asks whether the suspect is 'actively resisting arrest or attempting to evade arrest by flight.'" *Napouk*, 123 F.4th at 919 (quoting *Graham*, 490 U.S. at 396). As discussed previously, Naki repeatedly failed to heed the officers' commands to drop the machete and to back up, and he moved toward the officers with the machete in hand. Also, at two separate points during the altercation with the officers, Naki walked away from them, toward his car, in what appeared to be an attempt to leave the scene. [*See* Welch BWC 07:50:36, 07:52:51; Gandeza BWC 07:50:36, 07:52:53.]

Acknowledging that Naki failed to "comply with all of the officers' commands," Plaintiffs nevertheless argue that he did not resist arrest or attempt to flee, as he obeyed some of their orders and the officers did not inform Naki--in accordance with the Hawai'i statute on

arrests (HRS § 803-6[12])--that they were there to arrest him. [ECF No. 59 at PageID.475–76.] This Court is unpersuaded. In *Napouk*, the Ninth Circuit upheld the officers' use of force even though they did not explicitly inform the suspect he was under arrest, focusing on the suspect's actions of actively resisting the officers' orders to stop moving toward them and to drop the bladed weapon, and deliberately approaching them with that weapon. 123 F.4th at 919–20. Additionally, even assuming there is a violation of a state statute here, such violation does not independently render an officer's otherwise justified use of deadly force unconstitutional under the Fourth Amendment. To reiterate, claims of excessive force are analyzed under the Fourth Amendment's objective reasonableness standard.

In this case, Officers Welch and Gandeza repeatedly warned Naki that further noncompliance with their orders to stop or back up and to drop the machete would require them to use force. Still, Naki did not comply. He "actively resisted the officers' orders, satisfying *Graham*'s final factor."[13] *Napouk*, 123 F.4th at 920.

    d.    *Whether there were less intrusive alternatives and whether the suspect was obviously emotionally disturbed*

Plaintiffs argue that other factors like the availability of less intrusive alternatives and Naki's mental state suggest the officers' use of deadly force violated Naki's constitutional rights. [ECF No. 59 at PageID.477–78.] Although relevant to the totality of the circumstances,

---

[12] HRS § 803-6 provides, in relevant part, as follows: "At or before the time of making an arrest, the person shall declare that the person is an officer of justice, if such is the case. If the person has a warrant the person should show it; or if the person makes the arrest without warrant in any of the cases in which it is authorized by law, the person should give the party arrested clearly to understand for what cause the person undertakes to make the arrest, and shall require the party arrested to submit and be taken to the police station or judge. This done, the arrest is complete." HRS § 803-6(a).

[13] Plaintiffs' reliance on *Deorle* is inapposite, as the circumstances in that case are unlike here for the same reasons discussed *supra* Section IV.A.1.a.

*Glenn*, 673 F.3d at 872 (citations omitted), such factors "do not overcome the *Graham* factors to prove a constitutional violation where all three *Graham* factors favor the officers' use of force," *Napouk*, 123 F.4th at 920. But even if they could, each of these additional factors weigh in favor of the officers in this case. *See Napouk*, 123 F.4th at 920.

First, although officers are required to consider "if there were 'clear, reasonable and less intrusive alternatives' to the force employed," *Glenn*, 673 F.3d at 876 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010)), they "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct [the Ninth Circuit] identif[ies] as reasonable," *id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Here, the officers made efforts to use alternative means. They tried to engage with Naki for approximately three minutes, even when Naki approached within close proximity of Officer Welch; they retreated when Naki deliberately advanced toward them; and Officer Welch used a taser--which was ultimately not successful in subduing Naki. Additionally, the officers tried to deescalate by saying things like "come on bah, put it down" [Welch BWC 07:51:55; Gandeza BWC 07:51:54]; "hey hey, just drop the machete bro, listen to me, drop the machete" [Gandeza BWC 07:52:13]; "please" [Welch BWC 07:52:17]; "you ain't gotta get to this point" [*id.* 07:52:21; Gandeza BWC 07:52:19]; and again, "drop the machete bro" [Gandeza BWC 07:52:26]. Only when Naki advanced toward the officers for--at least--the tenth time with what they had immediately recognized was a large machete, came within three to five feet of Officer Welch, and failed to follow commands to stop or back up and to drop the machete did the officers use deadly force.

Relatedly, Plaintiffs contend there were less intrusive options available to Officers Welch and Gandeza, but they instead escalated the encounter. [ECF No. 59 at

PageID.477.] In support of their argument, Plaintiffs offer the statements of McCarthy, who opined that the officers had ample room to retreat, delay arrest, or use de-escalation tactics. This argument fails to notice several facts: the officers did in fact use de-escalation tactics as described *supra*; the situation was already intense when officers encountered Naki because he was armed with a long-bladed weapon; and the officers retreated more than once throughout the encounter, with Officer Welch ultimately standing near his police vehicle when he and Officer Gandeza finally employed deadly force. That the officers did not retreat another time does not shift their use of deadly force from reasonable to unreasonable conduct. Moreover, Plaintiffs' argument overlooks the well-settled principle "that officers need not employ the least intrusive means available so long as they act within a range of reasonable conduct." *Glenn*, 673 F.3d at 878 (citation omitted).

Secondly, whether the officers knew Naki was mentally unstable is a relevant consideration, *id.* at 875 (citation omitted), but it "does not negate the serious threat he" posed to the officers on the day in question, *Napouk*, 123 F.4th at 921. The governmental interest in using deadly force against a suspect who is emotionally disturbed is diminished "*only* 'where such an individual is neither a threat to himself nor to anyone else.'" *Napouk*, 123 F.4th at 920 (quoting *Bryan*, 630 F.3d at 829 (emphasis added)). Here, on the other hand, Officers Welch and Gandeza were confronted by Naki who was armed with a large machete and not only moving forward and backward in an unpredictable way, but also then abruptly advancing toward the officers. "If anything, [Naki's] mental state and erratic behavior made [him] more of a threat to the officers

26

because he clearly was not behaving rationally or in a predictable manner *when he repeatedly approached them with a bladed weapon*."[14] *Napouk*, 123 F.4th at 921.

Like the *Graham* factors, the additional factors of less lethal means and Naki's mental state weigh in favor of a finding of reasonableness.

e.    *Conclusion as to factors*

In short, the undisputed facts of this case show that Naki did not "simply possess[] what [the officers] believed was a bladed weapon, or [stand] in one place, or merely fail[] to comply with their commands to drop the weapon." *Napouk*, 123 F.4th at 922. Rather, he deliberately advanced toward Officer Welch with a machete and repeatedly ignored the officers' commands to drop it and to stop or back up. Taken together, these undisputed facts lead this Court to conclude that the officers' use of deadly force was necessary and that, as a consequence, there is no constitutional violation.

2.    *The officers did not violate clearly established law.*

Even if this Court were to conclude that there is a dispute of material fact as to whether the officers' use of deadly force was reasonable, the officers would still be entitled to qualified immunity because there is no clearly established law finding otherwise. "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). In the Fourth Amendment context, "specificity is especially important," where "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the

---

[14] McCarthy's opinion that "the officers failed to leverage" information gained from their prior contacts with Naki [ECF No. 60 at PageID.514] is similarly unpersuasive for the same reasons, in addition to the fact that Naki was known to be combative and had acted violently or erratically on prior occasions.

factual situation the officer confronts." *Id.* at 6 (quoting *Mullenix*, 577 U.S. at 12). Hence, the burden is on the plaintiffs to identify a case that put the defendants on notice that their specific conduct was unlawful. *Id.* In this case, Plaintiffs have not done so.

As an initial matter, the Court has already determined that Naki posed an immediate threat to the safety of Officers Welch and Gandeza for the reasons discussed *supra* Section IV.A.1.a. Therefore, the Court rejects Plaintiffs' argument that "it was clearly established that 'a suspect's previous violent conduct does not justify non-trivial force *where the suspect poses no immediate safety threat*.'" [ECF No. 59 at PageID.482 (citing *Andrews v. City of Henderson*, 35 F.4th 710, 719 (9th Cir. 2022) (emphasis added)).] The Court similarly rejects Plaintiffs' assertion that summary judgment in this case is precluded pursuant to *Hyer v. City & County of Honolulu*, 118 F.4th 1044 (9th Cir. 2024). Unlike in *Hyer*, where the officers forced the confrontation with the suspect who was barricaded in his room, and there was conflicting evidence in the form of eyewitness accounts and internal inconsistencies with the officers' statements and deposition testimony, 118 F.4th at 1052–54, 1062–63, there is footage in this case from the officers' body-worn cameras conclusively establishing that Naki posed an immediate threat to the officers as he intentionally advanced toward them on a public roadway while armed with a machete.

Furthermore, Plaintiffs' reliance on *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018), for the proposition that the law was "clearly established that officers must exercise greater restraint when they believe a suspect is mentally ill" is unavailing. [ECF No. 59 at PageID.482.] Whether the suspect has displayed signs of mental illness is but one factor in the reasonableness analysis under the Fourth Amendment, *Vos*, 892 F.3d at 1034 n.9, and Naki's mental state did not diminish the governmental interest in using deadly force, *see supra*

Section IV.A.1.d. Moreover, *Vos* is distinguishable as to the strength of the government's interest in that the officers in that case were not responding to the report of a crime; they established a defensive position behind their vehicles upon arrival; they outnumbered the suspect eight to one; the suspect was within twenty feet of the officers when he was shot; the officers did not believe the suspect had a gun; and only eight seconds had passed between the suspect's emergence and the shooting. *Vos*, 892 F.3d at 1031–33. By contrast, Officers Welch and Gandeza responded to the report of a crime essentially founded on allegations of domestic abuse; they had no defensive cover; they were the sole officers on scene; they saw Naki holding a machete; Naki was within three to five feet of Officer Welch when he was shot; and approximately three minutes had passed between the initial encounter and the shooting.[15] Equally important, although the Ninth Circuit in *Vos* held that summary judgment was improper on the reasonableness of the officers' use of force, it ultimately affirmed the district court's grant of summary judgment as to the officers on the Section 1983 claims, concluding that the officers were entitled to qualified immunity because they did not violate clearly established law. 892 F.3d at 1034–36.

Plaintiffs have not identified any existing precedent that places the conclusion that Officers Welch and Gandeza "acted unreasonably in these circumstances 'beyond debate.'"[16] *Id.*

---

[15] As stated previously, the officers also repeatedly instructed Naki to drop the machete, using alternative means of force throughout the encounter before being compelled to finally employ deadly force.

[16] Contrary to Plaintiffs' position, *Blanford* and *Napouk* support, rather than undermine, this Court's conclusion that Officers Welch and Gandeza did not violate clearly established law. The Ninth Circuit's decisions in those cases hinged on circumstances nearly identical to the ones present here, including that the suspect was armed with a weapon and that the suspect failed to obey officer commands. *See Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1116 (9th Cir. 2005) (concluding that the deputies were justified in their belief that the suspect posed a serious danger to themselves and others "because he failed to heed warnings or commands and was armed with an edged weapon that he refused to put down"); *Napouk*, 123 F.4th at 916 ("As the officers reasonably perceived it, [the suspect] was holding a long, bladed weapon, walking toward one of them and failing to follow commands to stop or to drop the weapon.").

at 1035 (quoting *Mullenix*, 577 U.S. at 14). As such, the officers are entitled to qualified immunity.

### B.    Fourteenth Amendment

Plaintiffs argue that a reasonable jury could find that the officers' conduct violated Naki's parents' Fourteenth Amendment right against deprivation of familial relationship. [ECF No. 59 at PageID.484–85.] The Ninth Circuit has held that parents have a due process right to companionship of their adult decedent child. *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 923 (9th Cir. 2024) (citing *Sinclair v. City of Seattle*, 61 F.4th 674, 678–79 (9th Cir. 2023)). Even assuming--for purposes of this Order--that Naki's parents could assert a substantive due process claim based on his death, "'only official conduct that "shocks the conscience" is cognizable as a due process violation.'" *Sinclair*, 61 F.4th at 680 (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)).

In determining whether an officer's use of deadly force "shocks the conscience," the court must first inquire "whether the circumstances are such that actual deliberation [by the officer] is practical." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (quoting *Porter*, 546 F.3d at 1137 (alteration in original)). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Id.* (quoting *Porter*, 546 F.3d at 1137). But "where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* (citing *Porter*, 546 F.3d at 1140).

Here, the encounter between Naki and the officers was fast-paced and short in duration such that "the officers had to react quickly" to an "evolving and escalating" situation, prompting them to make "'repeated split-second decisions.'" *Porter*, 546 F.3d at 1139–40

(quoting *Bingue v. Prunchak*, 512 F.3d 1169, 1176 (9th Cir. 2008)). Therefore, the "shocks the conscience" standard is met in this case by showing that the officers acted with a purpose to harm for reasons unrelated to legitimate law enforcement objectives. Contrary to Plaintiffs' argument, there is no such evidence in the record. Ergo, the officers are entitled to judgment as a matter of law on Plaintiffs' substantive due process claim.

### C.     State Claims

With the loss of federal subject matter jurisdiction, the question becomes whether this Court should still consider Plaintiffs' remaining claims--which are asserted under state law. "When federal claims are dismissed before trial, the question whether pendent state claims should still be entertained is within the discretion of the district court." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citing *Schultz v. Sundberg*, 759 F.2d 714, 718 (9th Cir. 1985)); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."). The Ninth Circuit has "held that the proper exercise of discretion is to dismiss the pendent state claims as well." *Cook, Perkiss & Liehe*, 911 F.2d at 247 (citing *Jones v. Cmty. Redevelopment Agency*, 733 F.2d 646, 651 (9th Cir. 1984)).

Here, the Court has determined that summary judgment on Plaintiffs' federal claims is warranted. Accordingly, it declines to retain supplemental jurisdiction over Plaintiffs' state claims.

V.          CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment, ECF

No. 55, is GRANTED as to Count I. As to the pendent state claims, Counts II–VI, they are

DISMISSED WITHOUT PREJUDICE.[17]

IT IS SO ORDERED.

DATED: Honolulu, Hawaiʻi, February 10, 2026.

Shanlyn A.S. Park
United States District Judge

---

[17] The pendent state claims are being dismissed without prejudice to allow Plaintiffs an opportunity to file such claims in state court, the forum "better suited to address these issues of state law." *See Reed v. Iranon*, 940 F. Supp. 1523, 1531 (D. Haw. 1996).